UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **JOSHUA M. PACE**, <br><br> Petitioner, <br><br> vs. <br><br> **MELINDA BRAMAN**, <br><br> Respondent. | 2:22-CV-11306-TGB-KGA <br><br> HON. TERRENCE G. BERG <br><br> **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS (ECF NO. 1);** <br><br> **DENYING CERTIFICATE OF APPEALABILITY;** <br><br> **AND DENYING LEAVE TO APPEAL IN FORMA PAUPERIS** |

Petitioner Joshua M. Pace, an inmate confined at the Richard A. Handlon Correctional Facility in Ionia, Michigan, has filed this petition for a writ of habeas corpus under 28 U.S.C. § 2254. ECF No. 1. Pace is serving a lengthy prison term for his Wayne County Circuit Court jury trial conviction of carjacking and unlawfully driving away a motor vehicle. Because neither of the two claims raised in the petition merit habeas relief, the petition is **DENIED**. The Court also **DENIES** issuance of a certificate of appealability and **DENIES** leave to proceed in forma pauperis on appeal.

I.     BACKGROUND

Petitioner's convictions for carjacking and unlawful driving away of a motor vehicle were based on allegations that he and another man,

Timothy Murry, carjacked two women in Dearborn, Michigan on November 5, 2017. *People v. Pace*, No. 350079, 2021 WL 297814, at *1 (Mich. Ct. App. Jan. 28, 2021). While Petitioner was unarmed, the state maintained that Murry held the gun on the two women as Petitioner demanded they turn over their money and vehicle. *Id.*

Both of the victims, Amara Altairi and Aman Alrayyashi, testified at trial with the aid of an interpreter and gave substantively identical accounts of the carjacking. Altairi recalled that on the date of the incident, she and Alrayyashi had parked Altairi's Cadillac Escalade on a residential street in Dearborn. *Id.*; *see also* Trial Transcript, ECF No. 8-23, PageID.637, PageID.644–45. As Altairi was getting out of the vehicle, a red car pulled up next to her. ECF No. 8-23, PageID.646. A man Altairi identified as Petitioner got out of the driver's side and another man holding a handgun got out of the passenger's side. *Id.* at PageID.646–49.

After Petitioner and Murry approached Altairi and Alrayyashi, Petitioner demanded that Altairi give him her money. *Id.* at PageID.649–50. Petitioner then gestured to Murry to approach Alrayyashi, who was making a phone call in the passenger's seat of Altairi's car. *Id.*

Neither Alrayyashi nor Altairi had any cash, so Altairi gave Petitioner a ring, which Petitioner pocketed. *Id.* at PageID.650. Petitioner ordered Altairi and Alrayyashi to get back into Altairi's car with Murry and ordered them to follow him in his car. *Id.* at PageID.652–

2

53. Petitioner threatened the women by telling them that Murry would kill them if they did not comply. *Id.* at PageID.655–56. But instead of complying, the women ran from the vehicle to a nearby house where they were able to call the police. *Id.* at PageID.657–58. Petitioner and Murry drove away in the two vehicles. *Id.* at PageID.658.

As explained in greater detail below, both women made statements to the police near the scene. *Pace*, 2021 WL 297814, at *1. The women were not fluent in English, nor could they read and write in English, so they had a friend and relative translate and write out their respective statements. *Id.* Defense counsel attempted to cross-examine Altairi with perceived discrepancies between her trial testimony and her written statement, but the trial court sustained the prosecutor's hearsay objection and barred defense counsel from questioning Altairi on the written statement. ECF No. 8-23, PageID.679–80.

Shortly after the carjacking, Genaro Damien-Silva was driving on Southfield Freeway and found his exit ramp blocked by a stationary Escalade and a red vehicle. *Id.* at PageID.750–54. Damien-Silva testified that he stopped his car behind the Escalade and red vehicle, saw three men get out of the cars, and observed the men arguing. *Id.* at PageID.752–53. Two of the men took off in the Escalade while the third man stayed behind. *Id.* at PageID.754. The third man approached Damien-Silva's vehicle and told him that he had just been robbed. *Id.* at

PageID.755. Damien-Silva said he would not be able to identify the man who spoke with him. *Id.* at PageID.756–77.

The Escalade was later involved in a police chase and crashed into a parked vehicle. Trial Transcript, ECF No. 8-24, PageID.802–05. After the Escalade crashed, officers followed the driver on foot and located a gun that had been discarded. *Id.* at PageID.812–17. The driver, later identified as Murry, was arrested. *Id.* at PageID.865.

Another witness, Thaddeus Broom, testified that on the same night of the carjacking, he was at his apartment in Dearborn when he heard someone outside yelling for help. ECF No. 8-23, PageID.769–72. Broom recalled that the man he heard yelling said he had just been robbed. *Id.* at PageID.771–72. Broom allowed the man to use his telephone to call 911. *Id.* The parties stipulated that the 911 call was made by Petitioner. *Id.* at PageID.775.

Officer Sergio Popescu responded to Petitioner's 911 call at Broom's address. *Pace*, 2021 WL 297814, at *1. Upon arrival, Popescu noticed that Petitioner matched the description of one of the suspects from the carjacking. *Id.* Popescu arrested Petitioner and read him his *Miranda* rights. *Id.* Petitioner claimed that Murry struck his vehicle on the Southfield Freeway, at which point Petitioner ran to Broom's apartment. *Id.*

Based on this evidence, the jury convicted Petitioner of carjacking and unlawfully driving away a motor vehicle. Following sentencing, Petitioner filed an appeal in the Michigan Court of Appeals alleging a violation of his Sixth Amendment confrontation rights when the trial court barred his counsel from impeaching the victims using prior inconsistent statements; challenging the constitutionality of the Michigan Supreme Court's decision in *People v. Carpenter*, 627 N.W.2d 276 (Mich. 2001); and raising a *Brady* violation based on the prosecution's withholding of body camera footage until two weeks before trial.

The Michigan Court of Appeals affirmed Petitioner's conviction in an unpublished opinion. *People v. Pace*, No. 350079, 2021 WL 297814 (Mich. Ct. App. Jan. 28, 2021).

Petitioner then filed a pro se application for leave to appeal in the Michigan Supreme Court. The application raised the same claims Petitioner presented to the Court of Appeals. The Michigan Supreme Court denied leave to appeal. *People v. Pace*, 962 N.W.2d 291 (Mich. 2021) (unpublished table decision).

The present habeas petition asserts two claims raised by Petitioner's appellate counsel on direct appeal: (1) prejudicial error based on the trial court's refusal to permit impeachment of the victims using prior inconsistent statements; and (2) the unconstitutionality of the

5

Michigan Supreme Court's decision in *People v. Carpenter*. ECF No. 1, PageID.4–7.

## II.  LEGAL STANDARD

A habeas petition filed under 28 U.S.C. § 2254 is subject to the heightened standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). To obtain relief, habeas petitioners challenging "a matter 'adjudicated on the merits in State court' [must] show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).

The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). In other words, "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Furthermore, a state court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and the federal court's review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

### III. DISCUSSION
#### A. Whether Petitioner's Sixth Amendment Confrontation Rights Were Violated

Petitioner first claims that he was denied his right to confront witnesses under the Sixth Amendment when the trial court prohibited him from impeaching Altairi with the contents of her written statement made shortly after the carjacking. ECF No. 1, PageID.4. Specifically, Petitioner claims that Altairi testified at trial that she gave her ring to him and that he verbally threatened her life. *Id.* Petitioner claims that those allegations are absent from Altairi's written statement, and he should have been permitted to offer her written statement for impeachment purposes on cross-examination. *Id.*

In rejecting the claim, the Michigan Court of Appeals first recited the applicable standard regarding the right to confrontation. *Pace*, 2021 WL 297814, at *2. The Court of Appeals properly noted that when

7

considering any "nonstructural, preserved constitutional error, an appellate court should reverse unless the prosecution can show that the error was harmless beyond a reasonable doubt." *Id.* (quoting *People v. Plumaj*, 773 N.W.2d 763, 766 (Mich. Ct. App. 2009)).

The court found that Altairi's written statement in fact contained the allegation regarding the ring, so there was no basis for impeachment on that point. *Id.* at *3–4. The Court further explained that although the written statement did not refer to Altairi being verbally threatened with death, any error in preventing Petitioner from impeaching Altairi on that point was harmless given the "significant evidence" of his involvement in the carjacking. *Id.* at *4. The court summarized the evidence establishing Petitioner's ownership of the red vehicle that pulled up to Altairi's Escalade; Petitioner's conduct in approaching the victims, demanding money, and ordering them to follow his vehicle while Murry held them at gunpoint; and lack of evidence that Murry forced Petitioner to perpetrate the carjacking against his will. *Id.* The court also noted that the jury was free to credit Altairi's testimony that Petitioner threatened her life, even if her friend who translated the written statement did not include that information in the police statement. *Id.*

In general, "[u]nconstitutional limitations on cross-examination are normally subject to harmless-error analysis." *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Delaware v. Van Arsdall*, 475 U.S.

8

673, 684 (1986)). Where, as here, a state court determines that a constitutional error at trial is harmless beyond a reasonable doubt, a federal court cannot grant habeas relief without first applying both the test outlined in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), and the test that Congress prescribed in AEDPA. *Brown v. Davenport*, 142 S. Ct. 1510, 1517 (2022).

*Brecht* requires a state prisoner in a federal habeas proceeding to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial. 507 U.S. at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect or influence" means "actual prejudice." *Id.* at 637–38. Meanwhile, "AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial." *Brown*, 142 S. Ct. at 1525.

Here, not every fairminded jurist would agree that the failure to allow defense counsel to cross-examine Altairi with the contents of the written statement was prejudicial or had a substantial and injurious effect on the outcome of Petitioner's trial. As reasonably determined by the state court, the unusual circumstances surrounding the generation of the written statement—which was translated and transcribed by Altairi's friend because Altairi could not write or communicate in English—made the statement less useful on cross-examination than in the ordinary case. Altairi was not in a position to review the written

9

statement after it was prepared to be certain that it was accurate. To the extent there were discrepancies in the details between Altairi's testimony and the contents of the statement, fairminded jurists could reason that any prejudice was minimized by the plausible explanation that some details were lost in translation. *See Pace*, 2021 WL 297814, at *4.

Moreover, at least with respect to the gold ring, as reasonably determined by the state court, it appears that Altairi did tell the police that she gave or attempted to give her ring to Petitioner in her written statement. Despite the statement's use of ambiguous pronouns when describing the sequence of events, it is undisputable that Altairi consistently testified that when the perpetrators demanded money, she attempted to give them her ring because she did not have cash. A fairminded jurist could find that any minor discrepancy between her trial testimony and written statement was not prejudicial to Petitioner and did not have a substantial impact on the outcome of the trial.

As to the inconsistency of Altairi's statement regarding being verbally threatened with death by Petitioner, Petitioner correctly asserts that this allegation does not appear in Altairi's written statement. Nevertheless, Altairi's trial testimony was substantially similar to her written statement describing how she saw one perpetrator carrying a gun while Petitioner demanded the money, and that perpetrator pointed a gun at the victims as Petitioner ordered her to follow his car. The

10

presence of the visible gun combined with the demands for money and orders to get in the vehicle at gunpoint were reasonably understood by the women as threatening their lives if they did not comply. A fairminded jurist could find that the difference between such an implied threat and a verbalized threat is not so great as to warrant a finding of actual prejudice.

Moreover, as the Michigan Court of Appeals summarized, there was extensive evidence of Petitioner's involvement in the carjacking that the jury could rely upon in finding him guilty. Therefore, Petitioner's inability to cross-examine Altairi with the prior written statement that did not include a verbalized threat did not have a substantial impact on the result of the trial.

The Court's reading of Altairi's trial testimony and the written statement indicates that she consistently stated that Petitioner was the man who directed the robbery, made demands of the women in view of his armed accomplice, accepted a ring in lieu of cash, and drove off with the two vehicles after the women ran. Any perceived inconsistencies between the testimony and statement were minor and unsurprising in light of the language difficulties involved.

Accordingly, Petitioner fails to demonstrate entitlement to habeas relief based on his first claim.

### B. Whether Petitioner Is Entitled to Habeas Relief on State Law Grounds

Petitioner also asserts that he was denied his right to present a defense because state law prohibited him from arguing that he suffers from a diminished mental capacity and was manipulated by Murry into participating in the crime. ECF No. 1, PageID.6. In the Michigan Court of Appeals, Petitioner argued in that the Michigan Supreme Court's decision in *People v. Carpenter*, 627 N.W.2d 276 (2001), unconstitutionally restricted his ability to present diminished capacity defenses short of insanity. ECF No. 8-27, PageID.1102. The Michigan Court of Appeals rejected the claim on grounds that it had no authority to overrule *People v. Carpenter*, such that no relief could be granted. *Pace*, 2021 WL 297814, at *5–6.

In 1994, the Michigan legislature enacted Michigan Compiled Law § 768.21a, which set forth the legal standards for an insanity defense in Michigan. In *Carpenter*, the Michigan Supreme Court subsequently held that this statute abolished the previously recognized common law defense of diminished capacity. 627 N.W.2d at 285. Accordingly, the legal insanity defense, as established by the Michigan Legislature in § 768.21a, was "the sole standard for determining criminal responsibility" as it relates to mental illness or cognitive impairment. *Id.*

Petitioner argues that by limiting mental-state defenses to legal insanity, state law unfairly prevented him from presenting evidence that

12

otherwise would tend to negate an element of the offense. However, in *Clark v. Arizona*, the Supreme Court held that states are "free to define the insanity defense" and may preclude a diminished-capacity defense. 548 U.S. 735, 772, 773 n.42 (2006). The Supreme Court also acknowledged that "a State that wishes to avoid a second avenue for exploring capacity, less stringent for a defendant, has a good reason for confining the consideration of evidence of mental disease and incapacity to the insanity defense." *Id*. at 772. The Court found no deprivation of due process in a state's decision "to channel . . . expert testimony to consideration on the insanity defense." *Id*. at 778. *Clark* leaves little doubt that the Michigan Supreme Court's interpretation of the state legislature's decision to limit all mental capacity defenses to the insanity defense does not offend the Due Process Clause of the U.S. Constitution.

Moreover, Petitioner does not suggest or proffer any indication that he was denied an opportunity to present a legal insanity defense as defined by state law. Accordingly, this claim is without merit.

## IV. CONCLUSION

The Court concludes that Petitioner is not entitled to federal habeas relief. Accordingly, the petition for a writ of habeas corpus is **DENIED** and **DISMISSED with prejudice**.

Before Petitioner may appeal, a certificate of appealability ("COA") must issue. 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A COA may

issue only if a petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The substantial showing threshold is satisfied when a petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court concludes that jurists of reason would not find the Court's disposition of the petition debatable. Accordingly, the Court **DENIES** issuance of a certificate of appealability.

Lastly, the Court concludes that any appeal of this Order would be frivolous and not taken in good faith. The Court **DENIES** Petitioner leave to proceed in forma pauperis on appeal. *See* Fed. R. App. P. 24(a).

**IT IS SO ORDERED.**

Dated: May 31, 2023      s/Terrence G. Berg
                         TERRENCE G. BERG
                         UNITED STATES DISTRICT JUDGE